NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 12-567

STATE OF LOUISIANA

VERSUS

JAMES LEE BURKS, III

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 15911-11
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and J. David Painter, Judges.

**AFFIRMED.**

**John Foster DeRosier**
**Fourteenth Judicial District Court**
**District Attorney**
**Carla Sue Sigler**
**Assistant District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

 **Carey J. Ellis, III**
**Louisiana Appellate Project**
**707 Julia St.**
**Rayville, LA 71269**
**(318) 728-2043**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **James Lee Burks, III**

**EZELL, Judge.**

Defendant, James Lee Burks, III, was originally indicted on twenty-nine felony offenses. However, on April 14, 2011, the indictment was amended to seven counts of possession of a firearm by a convicted felon, violations of La.R.S. 14:95.1, one count of criminal street gang, a violation of La.R.S. 15:1403(A), one count of conspiracy to commit armed robbery, in violation of La.R.S. 14:26 and 14:64, three counts of armed robbery and armed robbery with a firearm, violations of La.R.S. 14:64 and 14:64.3, one count of assault by drive-by shooting, a violation of La.R.S. 14:37.1, and one count of aggravated battery, a violation of La.R.S. 14:34.

A jury trial commenced on June 20, 2011. On June 24, 2011, the jury returned its verdict. The trial court ordered a mistrial on count seventeen, possession of a firearm by a convicted felon, count three, criminal street gang, and count sixteen, aggravated battery. Defendant was found guilty of all the remaining counts. The trial court ordered a presentence investigation report.

Defendant was ultimately adjudicated a fourth and subsequent habitual offender and sentenced to eleven concurrent life sentences to be served without the benefit of parole, probation, or suspension of sentences.[1] At the habitual offender hearing and sentencing, prior to the adjudication, Defendant made an oral motion for a new trial based on new evidence. The motion was denied.

Defendant has perfected a timely appeal wherein he alleges the evidence was insufficient to sustain the verdicts of possession of a firearm by a convicted felon, conspiracy to commit armed robbery, armed robbery with a firearm, and assault by drive-by shooting.

---

[1]Defendant's habitual offender sentences are before this court on a separate appeal under docket number 12-568.

## FACTS

The events which resulted in Defendant's multiple convictions took place between November 2008 and May 2009. During this time, there were three armed robberies, which occurred on December 12 and 13, 2008, and May 3, 2009. These robberies involved five victims, one of whom was shot during the robbery. There was also a drive-by shooting on May 15, 2009, which resulted in permanent injury to an innocent bystander. There were group discussions on who to rob and how to commit the robberies. There were several participants in these activities: Defendant's wife, Kayla Miller Burks; Alissa LaComb; Leonard "Mooney" Hansbrough; Jay Don Rubin, Defendant's brother; Lorenzo Reed, another brother; Jamesa Burks, Defendant's sister; John "Nate" Nathan Truitt; and someone known only as "LaHerbert." Defendant also had a video made of him pointing and firing a gun and had pictures taken of him holding the gun. At the time Defendant committed these offenses, he had three prior felony convictions and was on probation.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by staff for errors patent on the face of the record. After reviewing the record, we find no errors patent regarding the Defendant's convictions.

## ASSIGNMENT OF ERROR

Defendant's sole assignment of error is that there was insufficient evidence that he committed the offenses of which he was convicted. He argues that Kayla Miller Burks' testimony was not credible for the reason she was angry at her husband for cheating on her and lied to the authorities regarding his involvement in the crimes alleged.

In *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, this court set forth the standard of review to be used by appellate courts in addressing a sufficiency review:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La.R.S. 14:64(A). Armed robbery with use of a firearm is a sentence enhancement provision which states that "[w]hen the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence." La.R.S. 14:64.3(A). A criminal conspiracy is defined as:

> [T]he agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
>
> If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other.

La.R.S. 14:26.

The statute which provides that it is illegal for a convicted felon to be in possession of a firearm, in pertinent part, provides:

> A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or possession of a firearm while in the possession of or during the sale or distribution of a controlled dangerous substance, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541, or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.

La.R.S. 14:95.1(footnote omitted).

Assault by drive-by shooting is defined as "an assault committed with a firearm when an offender used a motor vehicle to facilitate the assault[,]" and assault is defined as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La.R.S. 14:37.1 and 14:36. Finally, a battery is "the intentional use of force or violence upon the person of another[.]" La.R.S. 14:33.

Counts One and Two—possession of a firearm by a convicted felon

At trial, the State established that Defendant had three prior felony convictions: simple robbery, May 5, 2003; possession of controlled dangerous substance, schedule II, June 8, 2008; and possession of controlled dangerous substance, schedule II, February 17, 2009.

4

The State introduced into evidence three photographs of Defendant brandishing a gun and a video showing Defendant pointing and firing the gun. On the video, Defendant stated that he was "pumping" himself up. Jim Pruitt, an officer with Lake Charles Police Department, was qualified as a forensic analyst of digital medium. He testified that the photographs were taken on December 2, 2008, and the video was made on November 24, 2008. These exhibits substantiated that Defendant, a convicted felon, was in possession of a firearm on those dates.

December 12, 2008—Counts Five-Seven—armed robbery, armed robbery with use of a firearm, and possession of a firearm by a convicted felon

Shaun Cormie testified that on the evening of December 12, 2008, he was called by a man he knew as "Mooney." He stated that Mooney asked for a ride. Cormie picked Mooney up on Third Avenue and drove him to a location on O'Brien Street where another person got into the car and told him to drive around the block. The second person was the man who shot him. He testified that after he was told to pull over again on O'Brien Street, the second man pulled out a handgun and demanded money and drugs. He threatened to kill Cormie if he did not comply. Cormie gave the gunman everything in his pockets. When the gunman got out of the vehicle to search under the seats, Cormie managed to drive away. However, he heard gun shots and one bullet struck him in the leg. He drove to a local Exxon Station and called the police.

While Cormie admitted he was not able to identify the shooter from a photographic line-up provided to him a month after he was shot, at trial he positively identified Defendant as the shooter. He further admitted that he had been drinking that night and had hoped to obtain some drugs.

Alissa LaComb, Defendant's wife's friend, testified that on December 12, 2008, she was with Defendant and Kayla Burks driving around looking for drugs. In the area of O'Brien Street, they pulled the car over and Defendant got out. After a few minutes, she heard shots, and Defendant jumped back into the car yelling "I think I killed him[.]"

Kayla Burks's testimony corroborated LaComb's testimony. She testified that she, Defendant, LaComb, and LaHerbert picked up Leonard "Mooney" Hansbrough, and Mooney said he "had somebody he wanted to go meet to hit a lick[.]" She explained that meant either buying drugs or selling drugs. When they arrived at an O'Brien Street location, Defendant got out of the car and told her he was going to go with the other person in his car. She testified that she, Alissa, and LaHerbert drove away but did not even get down the block when they heard shots. She said Defendant called her back immediately to pick him up. "He got in the car and said he thought he killed him, he mighta killed him[.]" She testified the gun Defendant used that night was the same gun in the photographs the State produced. She stated he later sold the gun to a man named "Agon."

David Rupf, a detective with the Lake Charles Police Department, was investigating a drive-by shooting in May 2009. He testified that the investigation led him to Kayla Burks. At one point, she told him about the December armed robbery and showed him the above discussed photographs of Defendant holding a gun and told him that Defendant sold the gun to Agon Leblanc. As it happened, Detective Rupf recently arrested Leblanc in an unrelated incident and had recovered a 357 Magnum gun. The detective testified that once they learned who the victim of the December armed robbery was, they were able to match the gun recovered from

Leblanc to the bullet recovered from Cormie, thereby answering the question of who robbed Cormie at gunpoint and shot him and verifying Burks' story.

<u>December 13, 2008—Counts Eight-Ten—armed robbery, armed robbery with use of a firearm, and possession of a firearm by a convicted felon</u>

Alissa LaComb also testified that later, in the early morning hours, after the above-described robbery and shooting, she called two friends to come and get her from Defendant's trailer. The friends were Daniel Dufore and Josh Graham. She testified that after the two men arrived, Mooney and Defendant approached them as they sat in the car. After harassing the two men for a few minutes, Defendant pulled out the gun and demanded Dufore's iPhone. Kayla Burks also testified regarding the two men who came to get LaComb. She stated Defendant and Mooney were messing with the two men. After the two men left, Defendant had one of the men's iPhone.

Daniel Dufore testified that early in the morning of December 13, 2008, a girl called Graham, and they went to pick her up in Dufore's car. He said that he parked somewhere behind Cowboy's in a trailer park. Within a few minutes, two men came to the car, one to the passenger side and one to the driver's side. The man on the passenger side got into the car and asked for a ride someplace. Dufore told him he did not have enough gas to be driving around town. The man then asked if he wanted to buy drugs. Dufore said no. The man then seeing his iPhone asked him if he was a cop. At this point, the man standing by the driver's side door pulled up his shirt and showed him a gun. Dufore said that he handed the iPhone over without comment and drove away.

Dufore testified he called the police in the late morning. He testified he picked out the man who got into car from the passenger side from a photographic line-up, but he was not able to identify the man with the gun. However several months later, he

was given a photographic line-up in the district attorney's office, which included Defendant, and he picked out Defendant as the man who took his iPhone. He further identified Defendant in court as the man with the gun.

May 3, 2009—Counts eleven-thirteen—armed robbery, armed robbery with use of a firearm, and possession of a firearm by a convicted felon

Kayla Burks testified that on May 3, 2009, she and Defendant's sister, Jamesa Burks, drove in her car to L'Auberge Casino where they were supposed to pick up two men and bring them back to a Church Street location. There they were to meet up with Defendant, Lorenzo Reed, and Jay Don Rubin. The three men were in Rubin's white Lincoln. Saying that they had been stranded at the casino, they eventually got two men, Terry Pilgrim and Gerald Ford, to give them a ride home. They directed the two men to the Church Street rendezvous, and Jamesa Burks texted her brother that they were on their way. Once there, the three robbers were waiting and proceeded to pull the men out of the car at gunpoint and robbed them. While Burks said she did not see Defendant with a gun in his hand at that point because she and Jamesa walked away, she saw that he had a gun prior to and after when they all drove away in the same car. Both Pilgrim and Ford testified regarding the armed robbery: that they had agreed to give the girls a ride home and that three men robbed them at gunpoint.

After receiving limited use immunity, Lorenzo Reed testified that after the girls left for the casino, he, Rubin, and Defendant went to the casino. He stated after they saw the girls there, they went to "Nate's" house where they waited to be notified by the girls. He testified that they robbed the two men at gunpoint and that Defendant had his gun pulled out and pointed at the men.

Finally, Detective Rupf testified that based on Kayla Burks' version of events, he obtained surveillance video from L'Auberge on that date in the early morning

8

hours, and he saw "Kayla Burks, Jamesa Burks, and Lorenzo Reed walking all together prior to them splitting up and then meeting with the two victims, Mr. Pilgrim and Mr. Ford, but it also showed who I thought I observed was James Burks and Jay Don Rubin entering the casino."

May 15, 2009; Counts Fourteen and Fifteen—assault by drive-by shooting and possession of a firearm by a convicted felon

Noretta Guillory testified that on May 15, 2009, on Fournet Street, around four o'clock in the afternoon, she was sitting with a neighbor when an argument apparently broke out down the street. She saw three men in a white Lincoln as it sped away. Shots were fired from the Lincoln as she ran for cover. One bullet struck her car. She called the police and filed a report. However, later in the evening on the same day, as she and a few people were again sitting outside, the same white Lincoln came down the street firing guns as it drove by. "I mean all you could see was just fire and hear the bullets just hitting the houses." She ran toward her house, but was shot in the hip. The bullet lodged near her spine. The injury caused permanent partial paralysis.

Detective Rupf testified that while he was investigating the drive-by shooting on Fournet Street, he received a Crimestoppers tip that the white Lincoln belonged to Jay Don Rubin and that Defendant and Lorenzo Reed were with him at the time of the shooting. Reed testified that in the afternoon, there was an argument between Rubin and someone known as Lil' Tiger on Fournet Street and that as he, Defendant, and Rubin drove away from Lil' Tiger's place, Defendant fired his gun out the window of the vehicle. He said that the gun then jammed up. Kayla Burks testified that she was not with Defendant during the afternoon shoot-up. She testified he had called her and told her to bring him his gun, which was in her car. She indicated that later that evening, Defendant, Reed, and Rubin went back to the neighborhood, armed.

9

Court Four; Conspiracy to commit armed robbery:

In brief, the State alludes to a "failed robbery" briefly discussed by Kayla Burks at trial, as follows:

Q All right. Now, we talked about another event at the casino that happened before that robbery—

A Correct.

Q –on Church Street

A Yes.

Q Tell us briefly about that one. Ever so briefly.

A Okay.

Q Let me go ahead and ask you some questions. The victim, how many victims were there?

A Two.

. . . .

Q Was it successful?

A No.

Q Let's stop right there. That's all I want to talk about. After that unsuccessful robbery was there [sic] meeting you attended that James Burks was also in attendance at about that failed robbery?

A. Yes.

Q Tell us about that meeting.

A That was the next morning after the failed—it was—the little girl, Diesah, Lorenzo—Jamesa was there because it was her house. She was in the living room. Me, James, and I can't remember if LaHerbert was there or not, it's a possibility he was.

Q Okay. And what was discussed at that meeting?

A It was basically whatever—I mean James and Jay Don had their own conversation before that and Jay Don stood up and told everybody basically what they did right and what they did wrong, told Lorenzo he

was too slow, told Diesha she needed new clothes. She was kind of raggedly. Then told me you're good and then that's it.

The State then points to testimony given by Detective Rupf that "Kayla told him that '[t]hey lured a guy to a certain specific area, predetermined by James Burks, and somebody took the gun off somebody and it went south.'" The State concludes; "For this event, the defendant was convicted of conspiracy to commit armed robbery."

The fifth circuit set out the elements of conspiracy in *State v. Turner,* 11-870, pp. 8-9 (La.App. 5 Cir. 3/27/12), 91 So.3d 426, 432, as follows:

> The elements of the crime of conspiracy, La. R.S. 14:26, are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, and (2) an act done in furtherance of the object of the agreement or combination. The first element of conspiracy requires specific intent, which is defined in La. R.S. 14:10, as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Intent may be inferred from the circumstances of the transaction and the actions of the defendant.

> The second element of conspiracy is an overt act, which need not be unlawful. It may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of its object. *State v. Jackson*, 00-221 (La.App. 5 Cir. 3/15/01), 783 So.2d 482, 487, *writs denied*, 01-1071 (La.5/9/03), 843 So.2d 385, and 01-1258 (La.5/9/03), 843 So.2d 386. Proof of conspiracy may be made by circumstantial evidence. *Id.*

This court has noted that "The State has the burden of proving beyond a reasonable doubt that that the Defendant conspired to commit armed robbery and that either the Defendant or the co-conspirator acted in furtherance of committing the armed robbery." *State v. Perry*, 08-1304, p.8 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, 347, *writ denied,* 09-1955 (La. 6/25/10), 38 So.3d 352. In *Perry*, wherein this court found the evidence sufficient to support a conviction for conspiracy to commit armed robbery, the defendant argued that there was no testimony that there were set terms as to how or when the robbery was to occur and that the meeting at the Sonic Drive-In

11

was not an act in furtherance. He argued that they "'never agreed to rob anything and that they merely discussed if it was feasible.'" *Id.* This court noted that an officer testified that the defendant told him that he and his cousin waited across the street for the Sonic to close. The co-conspirator had worked at Sonic and knew when they would leave to deposit the day's receipts. Moreover, the co-conspirator testified that he and the defendant had discussed robbing the Sonic. This court further noted:

> With respect to the second element, the "act in furtherance," we find that the evidence was sufficient to sustain the conviction of armed robbery. Thus, "[p]erpetration of the actual crime is certainly an act in furtherance of the object of the agreement." *State v. Zeno*, 99-69, p. 9 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 706. Accordingly, we find that the evidence is sufficient to sustain the Defendant's conviction of conspiracy to commit armed robbery.

*Id.* at 348 (alteration in original).

The testimonies given by Kayla Burks, Detective Rupf, and Reed regarding the above discussed May 3, 2009 robbery of Pilgrim and Ford were more than sufficient to provide all the elements of a conspiracy to commit robbery. This was a discussed and laid-out plan. The two girls were sent to the casino with instructions to pick up two men and return with them to a predetermined location for the purpose of robbing them at gun point.

In his defense, Defendant offered first an alibi for the May 2008 robberies. Katrisha Williams and Karol Ann Burks, Defendant's sister, testified that around the first of May, she and Burks went to Lake Charles and took Defendant back to Cottonport. She could not give a specific date but testified there were two family reunions occurring about that time, her family and Defendant's family. She testified they attended both reunions. She stated that he stayed there with her until May 26, when she and Defendant's sister drove him back to Lake Charles. However, Detective Rupf testified that Defendant, Kayla Burks, Rubin, and Reed were in

Cottonport together in her car on the 22 of May. He got this information from the Cottonport Police Department. According to the police report, a vehicle identified as Kayla Burks' vehicle was involved in a shootout during that time period.

Defendant then presented testimony from two witnesses who testified that Defendant's wife either had sex with them or had heard her having sex in the next room with other men during her marriage to Defendant. One witness who was incarcerated with Defendant while Defendant was waiting to go to trial testified that late one night, Kayla Burks came and stood outside the jail, yelled at Defendant, and apologized for something. He said he heard her because he got up during the night to go to the bathroom. However, another witness, who was also in the parish jail at the time, testified that Defendant's wife showed up shortly after breakfast and stood outside and cussed him out. She yelled that she lied to the police.

During Defendant's argument for a new trial, Defendant produced a witness who was a cell mate with Defendant after the trial in the parish jail. The witness testified that he had had a relationship with Defendant's wife in 2009 and that she had told him then she lied about Defendant's involvement in the crimes to get back at him for cheating on her.

In *State v. R.R.,* 09-1410, p. 6 (La.App. 3 Cir. 5/5/10), 37 So.3d 501, 505-06, this court stated:

> It is well settled that the standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). In fact, this standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v.*

*Pigford,* 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521; *State v. Robertson,* 96-1048 (La.10/4/96), 680 So.2d 1165. That is to say, the appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94-3116 (La.10/16/95), 661 So.2d 442. The factfinder's role is to weigh the credibility of witnesses. *State v. Lambert,* 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724. Other than insuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 727; *State v. Turner,* 04-1250 (La.App. 3 Cir. 3/2/05), 896 So.2d 286, *writ denied,* 05-871 (La.12/12/05), 917 So.2d 1084. Indeed, a witness's credibility is "a matter of the weight of the evidence, not subject to appellate review." *State v. Strother,* 09-110, p. 15 (La.App. 3 Cir. 10/7/09), 19 So.3d 598, 607-08.

The court finds the State met its burden of proof on all of the elements of the offenses alleged. Defendant only attacks Kayla Burks' credibility. He argues that her motive to lie regarding his involvement in the offenses was to get back at him for cheating. However, as noted by the State, her accusations also implicated her in the crimes. Furthermore, Detective Rupf testified that many points of her allegations were verified, such as locating the gun that shot the victim, Cormie, which was the very gun Defendant had fired on the video and the video surveillance tapes from L'Auberge which showed Burks and Defendant's sister with the two victims. The surveillance video also showed Defendant, Reed, and Mooney at the casino that night, just as Kayla Burks indicated. Finally, there were the testimonies of Defendant's brother, Lorenzo Reed, and Alissa LaComb, which also substantiated Kayla Burks' accusations.

The jury had the benefit of hearing all of the testimonies and viewing the demeanor of the witnesses. There is nothing to indicate that their judgments in this case were irrational. We find there is no merit to this assignment of error.

**DECREE**

The court affirms Defendant's convictions.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules–Courts of Appeal. Rule 2-16.3.